RECEIVED

NOV 1 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MING SEN SHIUE
P.O. Box 1500
El Reno, OK  73036-1500
Reg. Nbr.  00499-041
       Petitioner

      v.

BUREAU OF PRISONS
320 First Street N.W.
Washington, DC  20534
      Respondent

CIVIL ACTION NO. 06CV01452 EGS

## BRIEF IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS AND MANDAMUS

Comes now, Ming Shiue, Petitioner, pro se, in the above styled and caption cause of action and filed previously with this court a petition for Writ of Habeas Corpus, by a person in Federal custody pursuant to 28 USC §2241 with Mandamus relief sought under 28 USC §1361.

Attached herewith Brief are exhibits which are incorporated by reference herein.

--COVER PAGE--

i

**TABLE OF CONTENTS**

Cover Page                                                          i

Table of Contents                                                  ii

Jurisdiction                                                        1

Exhaustion of Administrative Remedies                              1

Statement of Major Issues Presented                                2

Statement of Case

    Statement of Proceedings                             3

    Statement of Facts                                   3

Summary of the Arguments                                           7

ARGUMENTS

    I. Bureau of Prisons "Greater Security" Designation Restrains
       and Harms Petitioner's Liberty Interests

      A. Adverse Record Detrimentally Lengthens Sentence            8
         Duration by Eliminating Early Parole.

      B. Adverse Record Detrimentally Imperils Actual Release      10
         from Federal Sentence under Mandatory Parole.

      C. Overclassification Detrimentally Risk Life, Personal      12
         Safety, and Well Being Unnecessarily with Eternal
         Placement to Painful or Harmful Confinement.

    II. Due Process Infringed by Non-notification then Appeal Denials
       that offers Partial Replies and Obsolete Facts to Support
       Preordained Decision

      A. BOP Failed to Advance Notice or Explanation Before        15
         Applying "Greater Security" Management Variable into
         Petitioner's Record.

      B. BOP Abrogated Meaningful Remedy by Evading "Respond to"    16
         Obligation with Selective, Incomplete Replies and
         Presumptive Evidences to Justify Contrived Outcome.

    III. Eternal Overclassification for Obsolete, Ulterior Reasons  24
       that Conflicts with Agency Objective Precedents, is
       Arbitrary, Capricious, or Abuse of Discretion.

Table of Contents

(Continued)

IV. Bureau of Prisons Persecution of Assumptive "Greater     33
    Security" Continuum against Elderly, Model Inmate who
    for 25 Years Represents No Threat is Irrational.

V. BOP Remedy Denials Reflect Retribution Against Petitioner     40
   for Crimes Committed Rather Than Calm Deliberation of
   True Security Needs to Set Proper Individualized System
   of Care and Protection.

Relief Requested     43

Index of Exhibits     44

iii

## JURISDICTION

This court has jurisdiction to review Habeas Corpus action pursuant to federal title 28 USC §2241 with Mandamus as relief under 28 USC §1361. It is also within this courts power to consider related claims raised in this petition pursuant to 28 USC §1331(a), 5 USC §552a(g)(1) and 5 USC §702 & §706(2)(A).

Exemption to 18 USC §3625 is asserted by statute wording and ex post facto. The wording holds inapplicability to APA under subchapter C covering only those sentenced under subchapter D of chapter 227. Petitioner was never sentenced under those provisions.

Venue for this petition is properly sited where official(s) with final capacity to delegate or perform duty, should relief be granted, resides. Warden do not have authority to perform remedy sought without regional and central office approval. Oklahoma District judge cannot compell Bureau officials in Dallas, Texas or Washington D.C. to follow it ruling or orders.

Habeas Corpus is proper civil action to correct administrative error when nature of prisoner's custody is affected and absent any monetary claims for damages.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Institutional BP-9 (403762-F1) Exhibit 9-A1 commenced January 30, 2006 which was denied by Warden representative (Exhibit 9-B1) on March 1, 2006. Regional BP-10 (R1) Exhibit 10-A1 & A2 filed March 9, 2006 was subsequently denied by B. Rhodes (Exhibit 10-B1) on April 12, 2006. Central Office BP-11 (A-1) Exhibit 11-A1, A2, & A3 filed April 28, 2000, was rejected on technicality and after addition of 1 attachment copy

(A-2), resubmitted May 18, 2006 which was finally denied by unknown designee at Central Office on July 25, 2006 (Notification 8/02/06).

## STATEMENT OF MAJOR ISSUES PRESENTED

I.    DID THE BUREAU OF PRISONS HARM PETITIONER'S "LIBERTY INTEREST" WITH "GREATER SECURITY" DESIGNATION INTO CENTRAL FILE RECORD ?

**YES**

II. DID RESPONDENT INFRINGE "DUE PROCESS" WITH NON-NOTIFICATION THEN LATER DENY APPEALS WITH PARTIAL RESPONSES THAT PREDOMINATELY RELY UPON OBSOLETE REASONS TO JUSTIFY PREORDAINED DECISION ?

**YES**

III.   IS ETERNAL OVERCLASSIFICATION OF PETITIONER WITH OBSOLETE FACTS AND ULTERIOR REASONS THAT CONFLICT WITH AGENCY'S OBJECTIVE PRECEDENTS, ARBITRARY, CAPRICIOUS OR ABUSE OF DISCRETION ?

**YES**

IV.   IS BUREAU OF PRISONS' PERSECUTION OF "GREATER SECURITY" CONTINUUM AGAINST ELDERLY, MODEL INMATE WHO FOR OVER 25 YEARS HAS BEEN NO THREAT, RATIONAL ?

**NO**

V.    DOES RESPONDENT STANCE REFLECT RETRIBUTION FOR PAST CRIMES COMMITTED RATHER THAN CALM DELIBERATION OF PETITIONER'S TRUE SITUATION AND NEEDS ?

**YES**

## STATEMENT OF CASE

1.    **STATEMENT OF PROCEEDINGS**

Proceeding is an original civil action seeking relief for claimed constitutional, statutory, and agency rules infractions imposed by Bureau of Prisons' adverse determinations. This is a first time pro se filing regarding this matter. Petitioner ask the court's indulgence for any inadvertent legal error or transgression made within pleading.

2.    **STATEMENT OF FACTS**

Majority of facts can readily be ascertained by reading the attached exhibits, especially all administrative appeals then program statement 5100.07, especially Chapters 5, 7, 8, and 10. Remaining facts can be established from records and documents available from respondent files. Petitioner believe court can determine the facts and issues of law without need for his appearance at hearing.

Petitioner entered Bureau of Prisons (hereafter referred to as BOP) custody March 17, 1981. Paragraphs 1 and 2 of this petition already states the details of his sentences and imprisonment. Since in BOP custody, a remarkable documented account of a single minor violence incident (occurred while victimized during unprovoked attack) have been established throughout his long incarceration. Vital is the setting under which such unusual peaceful behavior was accomplished. Petitioner endured nearly quarter-century of hostile penitentiary conditions, where brutality reigns and aggressive, violent confrontations the norm. Observed were countless murders, assaults with and without weapons, and even riotings. Yet Petitioner achieved an exemplary and irenic record of behavior by refusing to succumb to or join in the mentality of hatred and violence surrounding him (see recommendations -Exhibit 1 & 2).

Because of sustained good conduct, Petitioner's security score, established by BOP policy, reached Low after July 2005. Due to mission change at FCI Three Rivers, all chronic care II inmates were to be transferred. Aware of this, Petitioner let his situation and medical needs be known (see Exhibit 3 & 4). He was told by case manager Jenson, unit manager Neil and CMC Molina that any security level change will be factored in redesignation. So after 25 years of ineligibility, a home state federal facility or Medical center work detail placement (Rochester, MN) was finally possible, as only low security qualify for aforementioned assignments.

Petitioner is almost 56 years old with severe hypertension (was as dangerously high 240/140) due to renal insufficiency (weak kidney function) and enlarged heart. Medical prognosis is high risk of stroke, heart attack or kidney failure. Presently, problem is somewhat controlled by daily prescriptions of 6 large different doses of medications. Petitioner is also suffering crippling arthritis in many joints (elbows, shoulders, knees, and feet) making basic motions like walking extremely difficult and painful. Because of bad kidneys, doctors are reluctant to prescribe pain-relief for fear of triggering kidney failure and dialysis. Should stroke or heart attack strike, only rapid access to emergency hospital can save his life.

Petitioner's family all resides in Minnesota. Octogenarian mother is ailing thus cannot travel far to visit, the last time over 15 years ago. Petitioner desires to see sole surviving parent before passing away that only a low security placement in home state would realistically at least allow.

On November 15, 2005, Petitioner was moved to FCI El Reno, OK. Upon arrival, request was made for reason why placement at medium/high

institution.  Case Manager Ellis told Petitioner to wait until Team

Review when such matters are discussed.  On December 21, 2005 during

team interview was when first mention of a "greater security" sanction

was placed on Petitioner's permanent record.  Previous BP-338 (2004)

forms showed no such special labeling.  Asking details as to Who, When,

and Why such action was suddenly required, non-informative or inferen-

tial answers were given.  Many informal resolution attempts thru unit

team were tried during January 2006.  Finally, Petitioner was told to

file grievance if he did not like the decision.

In proceeding thru administrative remedy, the futility of seeking

fair review surfaced when BOP gave incomplete and biased responses.

Exhibits show the "management variable" rule itself was never challen-

ged, rather the applied rationality of obsolete evidences used was.  The

introduction of undue prejudicial factors was also questioned.  When

pointed out as improper, more graphic, irrelevant details emerged in

later rejoinders.

Intent was never to dismiss the terrible sufferings caused to the

victims or families for which Petitioner deeply regrets and apologized

during parole hearing statement in 2003.  All Petitioner is asking was

focus be directed to proper security connections and not emotional bias.

By not providing reasoned and complete reply to all issues raised

by Petitioner during appeals, there is no recourse left to change ad-

verse decision except with civil action.  Such petition was filed on

receipt of BOP's final denial.

The basic facts should not be in dispute.  Petitioner did commit

horrible crimes 26 years ago for which he was properly sentenced to the

maximum extent by law.  He was not sentenced, however, for his crimes

to be overclassified forever and subjected to grievous injuries from race-based retributive attacks as was case During July 11, 2000 and March 8, 2004.

Since entering Federal custody, Petitioner has remorsefully accepted society's retribution by changing his characteristics from angry rejection and denials to responsibly serving out sentence peacefully and constructively.  Medically and physically, he is no longer the same person he entered prison as.

Upon attaining standards set by BOP, Petitioner earned Low security status in 2005.  That benefit was subsequently denied indefinitely by respondent's discretionary action on irrational basis, which continues today.

The major issue (see Argument III & IV) facing this honorable court is one of fair judgement under agency rules, statutory and case law. Since Petitioner was unable to gain impartial, truth finding administratively, he now seeks this court to rule on the facts, legal grounds, arguments presented forthwith.

## SUMMARY OF THE ARGUMENTS

Respondent's "greater security" designation adversely restrains Petitioner liberty by detrimentally harming both early and mandatory parole release. In essence, BOP is unduly influencing parole commission's discretion with stigma of a continuing danger. Also, indefinite overclassification risks Petitioner's life and personal security unnecessarily with eternal placement to painful and harmful confinement beyond the normal incidents of prison life baseline.

Petitioner's due process infringed by respondent non-notification practice then appeal denials that offer partial replies and obsolete facts to support preordained decision. Respondent failed to advance fair warning and explanation before adverse determination was implemented. Petitioner's right to meaningful remedy abrogated when BOP abused "shall respond to" obligation with incomplete, selective, reply and presumptive evidences to justify contrived outcome.

Respondent arbitrarily or capriciously contradicted many of its objective precedents by increasing Petitioner security level eternally for obsolete and ulterior reasons. BOP reversed own violence threat guidelines to misrepresent high risk today with offense record from over 25 years ago. Respondent omitted many favorable characteristics and opposing facts to misstate inclusively "all characteristics ... are considered in decisions."

Respondent persecution of "greater security" continuum against elderly, model inmate, who's proven to be no longer any threat or danger is irrational and unreasonable. To justify its action, respondent resorts to exaggerated concerns and broad assumptions while suppressing 25 years of countervailing evidences refuting perceived risks.

7

With both recency of evidences and well established agency prac-
tice supporting Petitioner Low security assignment, respondent still
maintain discretionary opinion and obsolete data to continue over-
classification.  Such extreme stance reflect retribution against
Petitioner for crimes committed rather than calm deliberation of true
security needs to set proper individualized system of care and protec-
tion.

Petitioner respectfully asks the court to require the Bureau of
Prisons to perform its duty according to lawful and agency policy
principles.

## ARGUMENTS

I.    BUREAU OF PRISONS "GREATER SECURITY" DESIGNATION RESTRAINS
      AND HARMS PETITIONER LIBERTY INTERESTS


A. ADVERSE RECORD DETRIMENTALLY LENGTHS SENTENCE DURATION BY
   ELIMINATING EARLY PAROLE.

Early parole consideration (18 USC §4206(a)) is conditional and delimited by 3 criteria.    Petitioner liberty is detrimentally affected when Parole Commission takes into account "information considered" per 18 USC §4207(1).  Specifically, the progress report BOP must make under 28 CFR §524.42(b), is the statutory intrim report every 2 years. Necessary content "shall include" present security level as stated in 28 CFR §524.42(f).  Having "greater security" need labeled in inmate's record harms parole release when Parole Commission consider "jeopardizing the public welfare" criterion.

While the opposing view no doubt will be "there is no right to parole", courts have always attached due process rights to the denial of parole release.  "Section 4206 also requires that there be "good cause" for a parole decision above the guidelines" quoting Hayward v USPC 659 F.2d at 861.  The same consideration applies to actions that restrains possibility for parole release such as "greater security", the progeny of "special offender" designation.

This argument was affirmed in Holmes v U.S. Board of Pardons 541 F.2d at 1249.  "His position is that although the grant or denial of ... parole are discretionary, his right to due process is violated when prison authorities take account of the special offender classification in making these determinations.  Given this fact, he has alleged a clear, ministerial, and nondiscretionary duty."

Later in Solomon v Benson 563 F.2d at 343, the same court over- ruled itself on other benefits such as furlough and transfers but "express no opinion concerning our holding in Holmes that procedural due process applies to classification as a special offender because of an

adverse effect on eligibility for parole," see footnote 7.

The defect with procedural due process in Petition's case was lack of notification and "meaningful manner" of grievance resolution (see Argument IIA & B). Where a liberty interest, even a limited one such as early parole in this context, is directly infringed by BOP discretion, petitioner is entitled to be fairly heard. Based on such, Petitioner asks court to closely scrutinize respondent's adverse determination for due process deficiencies.


B. ADVERSE RECORD DETRIMENTALLY IMPERILS ACTUAL RELEASE FROM FEDERAL SENTENCE UNDER MANDATORY PAROLE.

Release under mandatory parole from Federal custody is granted by 18 USC §4206(d) and 28 CFR §2.53(a). Both statute and regulation wordings severely limit the discretion of Parole Commission to deny parole only under two narrowly circumscribed criteria. There is no doubt that the essential liberty interest is̄ created by language standard held in many higher court rulings confirming due process rights.

"A liberty interest may arise from the constitution itself... or it may arise from an expectation or interest created by state law or policies." citing Wilkinson v Austin 162 L.Ed.2d at 189. In Wolf v McDonnell 418 US 539, 558 41 L.Ed.2d 951, held the loss of "good time credits" require due process. Petitioner maintains the withholding of freedom itself, any adverse action that imperils mandatory parole release, warrant the same if not greater due process protections.

"That a state creates a protected liberty interest by placing substantive limitations on official discretion. An inmate must show "that particular standard or criteria guide the state decisionmakers.""

citing Olin v Wakinekona 416 US at 249, 75 L.Ed.2d at 823 internal
quote from Conn. Board of Pardon v Dumschat 452 US at 467, 69 L.Ed.2d
at 167.  Petitioner offers mandatory parole regulations substantially
guide the parole commission's discretion (see 28 CFR § 2.53-01 Review
Procedures (a)) to create expectation of commutation of old law
life sentences.

Parole expectancy is affirmed in Evans v Dillahunty 662 F.2d at
526 "When one considers this specific limitation on the commission
exercise of discretion and the presence of the mandatory word "shall",
the conclusion that the federal parole statute creates a substantial
expectancy of parole follows."

Petitioner's release is restrained when parole panel at two-third
mandatory parole record review (28 CFR §2.53(b)) use "information"
considered under 18 USC §4207(1).  The required 2/3 progress report
(28 CFR §524.42(f)) specify content "shall include" present security
level.

Permanent "greater security" designation and unqualified "pro-
pensity for violence" statement, harms petitioner's release when
weighed against "reasonable probability the prisoner will commit"
future crimes conditional clause (18 USC §4206(d)).  In essence, BOP is
coloring or unduly affecting parole discretion by labeling petitioner
a continuing danger though in case here, without "good cause" and on
unreasonable assumptive basis.

While petitioner was sentenced to indeterminate imprisonment, that
punishment do not permit the BOP to indefinitely overclassify him as
"greater security" threat, preemptively harming parole release, or
negating proper due process protections.  In this case, respondent's
action was not only irrational (se Argument IV) but capriciously in

11

conflict or contradictorily with agency's own objective policies (see
Argument III).  Petitioner hereby request "strict scrutiny" protection
be upheld as his fundamental right to freedom is being abrogated by
respondent's controversial adverse determination.

C. OVERCLASSIFICATION DETRIMENTALLY RISK LIFE, PERSONAL SAFETY, AND
   WELL BEING UNNECESSARILY WITH ETERNAL PLACEMENT TO PAINFUL OR
   HARMFUL CONFINEMENT.

There is no doubt a low security placement within BOP's "integrated
system" is safer and less harmful than higher level institutions.  The
risk and reality of race based violence, being assaulted or even killed
is significantly greater at higher security.

Every inmate have personal security interest to be "properly class-
ified and segregated" from places of harm.  The intent shown and con-
ditions realized is created by "to assure" wording from 18 USC §4081
which the BOP promulgated with "Security Designation and Custody Class-
ification Manual" in Program Statement 5100.07 (hereafter refer to as
policy).  The latest manual (162 pages) contains fair, content neutral
rules that limit discretions to only when a management variable is used.
Then the key words "professional judgement" is authorized although
"within specific guidelines."

Petitioner sustained over 25 years of positive, exemplary behavior
in order to meet all objective BOP standards of Low security.  Once at-
tained, to be wantonly sanctioned to higher security unnecessarily and
resultant greater hostile, violent conditions, purely on speculation,
is harmful to Petitioner well being and safety.  Especially when there
is no end in sight when such recklessly dangerous assignment will cease
for aging inmate with serious medical and physical liabilities.

Petitioner offers liberty claim affirmed in Youngblood v Romeo 457

US at 315, 73 L.Ed.2d at 37 "The first is a claim to safe conditions. In the past, this court has noted that the right to personal security constitute a "historic liberty interest" protected substantially by the Due Process Clause... And that right is not extinguished by lawful confinement even for penal purposes."

Additionally, petitioner further the proposition stated in Helling v McKinney 509_ , 125 L.Ed.2d at 31 "That the Eighth Amendment protects against future harm is not a novel proposition." Finally, Petitioner's request for remedy from violence endangerment is recognized in Ramos v Lann 639 F.2d at 572 "he does not need to wait until he is actually assaulted before obtaining relief." Petitioner has already suffered 2 injurious attacks by race based gangmembers so his claims are not without merit and documented in respondent's files.

Forcing elderly, ailing inmate who is unable to run or even protect himself to suffer pervasive threat from younger, racially hostile and violent prisoners constitute fearful, deliberate cruelty when classification policy indicates lower security need so safer placement is feasible. Respondent has duty to "provide safekeeping, care and protection" under 18 USC §4042 and not place unreasonable risk of further harm to Petitioner with perpetual overclassification.

With subjective opinion that seriousness of long past crimes still justify harmful restrictions, Petitioner contends the BOP has "impose atypical and significant hardships on the inmate in relation to ordinary incidents of prison life..." quoting from Sandin v Conner 515 US at 424, 132 L.Ed.2d at 430. The baseline for "ordinary incident of prison life" here has been set by BOP. Respondent routinely burden old law life sentences to 25 years of hardships at high then medium security before allowing placement at low facilities (see policy Table 7-1). Extending "higher security" hardships and endangerment above guideline with

13

exposure to greater harm, imposes sufferings beyond normal baseline
as most inmates enjoy relief whenever low security criteria are met.
This sentence length baseline position is in accord with Hatch v
District of Columbia 184 F.3d at 856 which balance custody "in
relation to the most restrictive confinement conditions prison officials
routinely impose on inmates serving similar sentences."

While overclassification don't create liberty interest by itself,
the indefinite duration and total ramification of abusive discretion
can impact many painful effects.  Such include: parole denial, constant
threat to life and safety, familial deprivations, inferior medical care,
less rehabilitative considerations at higher security.  Totality of
suffering combined with extremely long and now unending term, reach
conditions cited in Wilkinson v Austin 162 L.Ed.2d at 190 "While any of
these conditions standing alone might not be sufficient to create a
liberty interest taken together they impose an atypical and signifi-
cant hardship within the correctional context."

The duration of deprivations is recognized in Fusari v Steinberg
419 US at 389, 42 L.Ed. 2d at 529 which quotes " The possible length
of wrongful deprivation of ... benefits [also] is a important factor
in assessing the impact of official action on the private interest."
Petitioner's interest were never factored into official decision.
Besides the greater endangerment, BOP was indifferent to petitioner
health issues.  Due to high risk of stroke, heart attack, the possibi-
lity of Medical center work assignment at Rochester was deprived.  Low
level placement there will greatly save his life should major health
failure occur.  Critical time will be lost getting clearance and escort
under greater restrictions to emergency hospital.  This is not a hy-
pothetical situation as an inmate recently died waiting for emergency

delivery while complaining of chest pains and breathing difficulty.

Respondent's overclassification unnecessarily jeopardize Petitioner's life, well being and health. Such permanent condemnation cannot be dismissed as trivial liberty interest thus must be carefully deliberated with due process. Petitioner respectfully ask court to recognize such, so strict scrutiny can be applied in adjudicating BOP adverse decisions against petitioner.

II.  DUE PROCESS INFRINGED BY NON-NOTIFICATION THEN APPEAL DENIALS
     THAT OFFER PARTIAL REPLIES AND OBSOLETE FACTS TO SUPPORT
     PREORDAINED DECISION

A. BOP FAILED TO ADVANCE NOTICE OR EXPLANATION BEFORE APPLYING
   "GREATER SECURITY" MANAGEMENT VARIABLE INTO PETITIONER RECORD.

Petitioner was not informed of "greater security" designation until after application and transfer to higher security institution. The who and when is still unclear as shown by Exhibit 7A and 7B. Inquiry letter to regional office in April 2006 was never answered by B. Rhodes nor personal request for intervention to Regional Director.

Perusal of policy reveals that BOP do not give prior notice. Process to apply management variable is done locally thru EMS.A409.051 form. The method is computerized (Groupwise) which inmate have no access to. The other method is by internal regional or central office fiat. In either case, unless staff tell inmate will there be any knowledge of such action. Otherwise inmates will never know until results appear on updated BP-338 form which is only done yearly at

15

custody review, provided a request is made to see update form.

"The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."" as cited in Mathews v Eldridge 424 US at 333, 47 L.Ed.2d at 32 with internal quotes from Armstrong v Manzo 380 US at 552, 14 L.Ed.2d at 66. Dispute being there is never any chance to be heard if petitioner lacked opportunity to be informed before adverse decision is made. Knowing long after the deed is done cannot satisfy "meaningful time" component.

This concept of "fair warning" has been previously observed by other BOP classifications such as Central Inmate Monitoring (with BP-340) and "Special Offender" (precursor to "greater security"). The Greater Security management level designation should not be shielded from advance notice requirement either. Increasing security level harms liberty interests (see Argument I) thus deserves just as much if not more warning.

Fact remains "greater security" inmates are not given written notice, nor apprised of the underlying evidence used, is offered no chance to be heard or contest the overclassification until well after action is taken. Administrative Remedy is offered but at best provide a show review "on the record" however the damage or sanction has already been done.

B. BOP ABROGATED MEANINGFUL REMEDY BY EVADING "RESPOND TO" OBLIGATION WITH SELECTIVE, INCOMPLETE REPLIES AND PRESUMPTIVE EVIDENCES TO JUSTIFY CONTRIVED OUTCOME.

Not providing "fair warning" BOP will point to Administrative Remedy as fulfilling due process (28 CFR §524.15). In theory such process suppose to correct flaws but in practice depends on mercy of agency discretion. The BOP tri-layer system appears to provide oversight, only when a clear violation of law is shown will adjustment be

granted.  The problem is always with discretionary based rulings where
"there is a real danger that the subsequent appeals by the prisoners
would be treated in a pro forma manner." warning cited by Judge
Edenfield in Mayo v Sigler 428 F.Supp. at 1350.

The BOP appeal mechanism is tilted against truth-finding.  The
department(or person) under complaint is also the one answering the
grievance.  Then remedy response is returned with higher authority's
blessing and signature.  While 28 CFR §542.11(3) requires investigation,
no independent truth-seeking  is ever done.  Such in-house self-review
cannot satisfy meaningful manner component of due process as it is not
human nature to find fault with ones own or co-worker's decision and
action.  Given these realities, it is as a practical matter, impossible
to prevail in any appeal challenging staff discretion.

Careful analysis or unbiased review of the issues raised in appeal
then evaded or left unanswered by BOP show exactly how self-policing
remedy does not work.

Required by 28 CFR §542.11(a)(4) the Institution, Regional and
Central Offices "Shall respond to and sign all Requests or Appeals filed
at their levels."  As defined in 28 CFR 500.1(e) "Shall means an ob-
ligation is imposed."  The key phrase is "Respond to" definition.

Respondent will argue the loose interpretation of merely giving
a reply or answer.  BOP believe any response - regardless if every
point/issue claimed in grievance is addressed - fills the obligation
required by regulation.  Petitioner beg the court not to absolve BOP
of due process in such cavalier fashion.  The "meaningful manner"
component from Armstrong must be preserved along with just plain fair
grievance process.  Picking and choosing which part(s) respondent will

17

address (see following items 1 & 2), while avoiding or totally ig-
noring everything else (see items 3 thru 7) in agency's response is
unacceptable as "meaningful" or dutiful complaint resolution.  The
"respond to" standard is vital in alleviating "the risk of an erron-
eous deprivation of such interest through the procedure used." citing
quote from Mathews 424 US at 335, 47 L.Ed.2d at 33.  Obviously, errors
(flaws) will never be admitted to or recognized if agency can select-
ively avoid and simply duck (react to) all portions of complaint.
Dereliction of "respond to" duty renders appeals process "meaningless"
so due process protection is ephemeral given the weakness of procedure
discretion allowed.

    The following are the defective or incomplete, non-responses from
all levels of BOP denials that abrogated meaningful due process.

 1. In every response, BOP quoted various phrasings of its management
variable "greater security" policy.  The rule itself was not the issue
rather "as applied" rationality was, yet respondent chose not to make
the distinction.  The grievance was against not heeding the meaning of
official words stated.  Especially, "to use professional judgement with-
in specific guideline" and "to ensure all characteristics of an inmates
case are considered." As will be later examined in detail (Argument
III) the two quoted criteria are exactly the faults in complaint.
Taking Petitioner well outside BOP guidelines and omission of all favor-
able characteristics that distract or refute the narrow slice of history
offered as evidence to support finding.  These discrepancies BOP never
specifically addressed or rationally explained when authoritatively
dismissing important grievance issues with generic statements of policy.

Finally, when referencing own policy, BOP even shows inconsistency
with applying its entitling authority (see Argument III last 6 para-
graphs) and questions its own created security level trustworthiness.

 2. In every reply, BOP states and restates all offenses committed over
25 years ago as definitive conclusion for alarming concerns.  Respon-
dent is performing post hoc rationalization to buttress determination
already made.  Claimed "violence propensity" from past is promoted as
certain danger, exaggerating true situation now with unbalanced distor-
tion as more certain, recent facts refuting conclusion are omitted.
Thus inherent bias of all "careful reviews" is exclusion of superior
records that will ensure a fair ruling.  Selectively appending infer-
ential facts from long ago because only they fit the decision made while
rejecting all others (non-mentioning allows respondent to avoid thorny
problem of explaining away own conflicting records refuting outcome),
is not fact-finding or truth-seeking but whitewashing.  Further, pre-
judicial or emotional details like victims age, attacking witness dur-
ing testimony, and other unrelated elements (videotaping?), produces no
additional threat or risk against order and security at any level penal
facility near end of sentences.  Those inexplicable, innuendo ladened
references need to be shown pertinent (Do those details prove  high
likelihood future misconduct?), else discarded as justification for
"greater security" requirement.  Objective concern should be violence
displayed, but after 25 years, with no reoccurrences and incapabilities,
the possibility of violent recidivism is nil.

 3. BOP never responded to **abuse of discretion** complaint charged in
institutional (Exhibit 9A1, sentence 1 & section 2b), regional (10A1,
sentence 1 and 10A2 paragraph 7), and central office (11A2, section II)
appeals.  Many departures from guidelines and practices were detailed

yet respondent failed to present germane explanation for deviation. Quoting back general statement of policy (see item 1) does not vindicate any abuse alleged. For example, making 25 year old violences suddenly as high risk, contrariwise to precedent set in Table 8-5, is not only inordinate, but using management variable authority is not explaining the basis for reversal either. BOP violation of policy standards using discretionary judgement instead of tangible rebutals, retrogress to the same position displayed in previous 1 & 2 section.

4. BOP never respond to **undue prejudicial influences** detailed in regional (Exhibit 10A2, para 5) and central office (11A2, section I para 2) appeals. Offering past aggravating factors that have no probable impact upon institutional operations (see item 2) is unfitting and extraneous. Respondent is interjecting emotional bias to gain credence for otherwise untimely evidences and far-fetch conclusions.

5. BOP never responded to **rationality** argument raised in institutional (Exhibit 9A1, sentence 2, section 1a & 2a), regional (10A2, para 2 & 3), and central office (11A2, section I para 1) appeals. Respondent reliance on inferences, assumptions and emphasizing old records over all other considerations, naturally renders desired results. Such technique cannot be fair-minded or untainted. BOP needs to spell out what belief system and thinking leads 25 year old offenses to conclude impending threat now, in spite of policy convention with recent evidences supporting low risk. Averting the essence of reasoning never solves problem, only prolong grievance.

6. BOP never respond to **favorable characteristics** that presently decreases risk concerns offered in institutional (Exhibit 9A1, section 2c), regional (10A2, para 4), and central office (11A3, footnotes 2 & 13) appeals. Refusing to weigh opposing facts, truths or arguments can

never reach just, meaningful findings.  All evidences must be included
and put in perspective during review -- not narrowly selected ones,
with time frame deleted, to result in preordained decision.

7. BOP never responded to Management Variable Expiration Date (**MVED**)
issue in all appeals.  Why the state sentence inactive date was not
entered in MVED, or a permanent overclassification is necessary once
detainer ends, was never explained.  Respondent arbitrary action without
responsive accountability is the exact fault complained here that self-
policing reviews will never admit much less remedy.

8. BOP never responded to **Constitutional Violations** claimed in region-
al and central office appeals.  Both liberty interest and due process
flaws, the same ones presented in this petition, were argued in appeal.
Respondent lack of concern is evident by its complete silence on this
subject.

9. BOP's disclaimer to a minor point is curious.  Respondent states in
Exhibit 11B1 sentence 5 "We do not find, nor have you provided any evi-
dence of discrimination."  The subject was barely mentioned in appeal,
see Exhibit 11A2 section II last sentence quoting "Discrimination was
transgressed but space preclude review."  No evidence was found be-
cause none was ever offered due to lack of space left!  Why BOP wasted
effort to deny a unfollowed up point yet avoids touching the more sub-
stantive claims (items 3-8) reveals one of two consequences.  Either
respondent does not comprehend (highly unlikely) or deliberately eluding
vital issues that can prove Petitioner's allegations.

The validity of administrative remedy is suspect.  Right to due
process challenging classification is granted by 28 CFR §524.15.  First
Amendment also guarantee right to petition government to redress grie-
vances.  Those rights are subsequently abrogated when "shall respond to"

duty is trampled with inadequate, partial or contrived response from in-house self reviews.

Mentioned earlier, effective protection depends on the procedure required or allowed to dismiss complaint. Permitting inattentive or incomplete answers to fill "respond to" obligation, with no teeth to come to grip on the critical meat of the matter, negates effect of regulatory law. Reasonable doubt is cast when supposed tri-layer reviews fail to even detect, investigate much less react to any of the discrepancies or faults (see item 1-8) cited in formal complaint. One would expect such obvious impugnment to be caught in later oversight.

The lack of any critical analysis is self evident. No faults or errors are ever attributed anywhere with each higher authority agreeing with previous rulings. Without independent, diverse evaluations that really seeks truths, agency inquires can never remedy injustices but arrive at the same self-serving results and stagnant denials.

BOP assembly line, rubber stamping practiced here cannot stand as procedural due process. Court must now inspect respondent's grievance production results ensure quality control of fairness and justice, particularly when petitioner's life , liberty, health and continuing deprivations are affected.

Appellate court have required "prison administrators alleged to have violated inmates rights **must** meet such challenges with edifying and il-luminating rejoinders drawn from their unique expertise." quoting Wil-liams v Lane 851 F.2d at 886. BOP's modest, templated response, lacking insight, while leaving many differences unexplained, does not match court standard when fundamental rights are challenged as case here.

Accordingly, Petitioner ask court to require BOP abide by the whole

22

intent of regulatory "respond to" obligation for due process protec-
tion.   Because respondent did not advance prior notice when applying
"greater security", nor later provide complete answers during appeal
that reasonably addressed every issue or ground for grievance, BOP
did not comply with the meaningful time and manner requirement for
due process, thus violated petitioner's right.

III.    ETERNAL OVERCLASSIFICATION FOR OBSOLETE, ULTERIOR REASONS
        THAT CONFLICTS WITH AGENCY OBJECTIVE PRECEDENTS, IS ARBITRARY,
        CAPRICIOUS, OR ABUSE OF DISCRETION.

Bar for "arbitrary and capricious" is established by prior case
law.  Essential wording is "such relevant evidence as a reasonable mind
might accept as adequate to support a conclusion." quoting from Ref-
rigerated Transport Co. Inc. v I.C.C. 616 F.2d at 751.  While review-
ing agency decision under same standard, court "must defer to the wis-
dom of the agency provided their decision is reasoned and rational."
Quotation cited in McHenry v Bond 668 F.2d at 1190.

The deference and relevancy of evidence is vital to Petitioner's
argument.  It is ironic the prisoner here stakes greater deference to
wisdom of BOP's objective rules and statements then respondent.  Peti-
tioner is singled out for exception because respondent claims its own
scoring system may not be accurate, a highly unbelievable stand.

Bureau security policy manual (5100.07) have matured extensively
thru 7 versions since inception in 1979.  The policy manual thoroughly
documents practices, incorporate comments and experiences to improve
classification results in every revisements.  As such decisions have
progressively become objective and consistent by following criteria that
are rational, content neutral and fixed rules.  Sole exception is the
"management variable" discretion, a subjective based procedure "to
provide staff an opportunity to use professional judgement **within**
specific guidelines." quoting page 3 section 5 and again in Chapter 8
page 1 paragraph 6 of program statement.

Respondent's use of "professional judgement" in present case to
demote its own greater body of expertise (p.s. 5100.07) taking Peti-
tioner outside policy guidelines, is issue in controversy.  Petitioner

24

asserts agency's formalized (interpretive) rules should trump dis-
cretionary judgement when dispute over reasonableness of specific
issue (i.e. violence risk) arise.  As instance here, respondent's
permanent overclassification for obsolete, assumptive reasons creates
overwhelming inconsistencies, contradictions, or obliterate agency
set precedents, rules, guidelines and statements.  Those conflicts
are demonstrated herein.

 1. Program Objective (page 3 section b) specify:"Inmates will be
placed...thru an objective system of classification."  Petitioner
placement at higher security is thru a purely subjective (opinion-
based) system of discretion, contradicting program objective.

 2. Respondent ignored self-established conceptual relationship bet-
ween past history and present security concerns as quoted from Chap-
ter 8 page 16.  "...(his history is further in the past), therefore
lowering the inmates security level and decreasing his custody."  In
a complete reversal of form, BOP leaped quarter century back to inflate
present security level, departing from stated practices.  Policy con-
ceptual norm is to diminish or disassociate concerns with inmate his-
tory the further it is in the past provided he has not committed new
crimes.  What unstated principle is respondent relying on to reverse
agency set precedent to justify its deviant position?

 3. BOP veer from the stated manner in which it will exercise a dis-
cretionary power by failing to "use professional judgement within spec-
ific guidelines."  Respondent exceeded many set guidelines by signifi-
cant margins to show wanton disregard of own policy intent.

 4. BOP invalidated own History of Violence guidelines (Table 8-5,
Chapter 8 page 8, "recency of prior violent incidents to measure risk

for violent behavior") when affirming over 25 years old offenses as
high violence risk today.  Such far fetch association refutes its own
expert research knowledge that measures serious violence under 5 years,
the highest risk, while **decreasing** threat assessment every 5 years
thereafter.  This abrupt change of precedent is glaring, a clear show-
ing of capriciousness.  Other inmates with just as serious violence on
their record were allowed placement at Low when they met the criteria.
Respondent never disclosed basis for reversal from own violence pre-
cepts or provide correlative reasoning to **increase** violence risk at this
late period.

   5. BOP replies implicated the severity and type of offense gave nec-
essity to discriminate petitioner for added security.  Respondent by-
passed its own neutral practice (Appendix B - Offense severity scale
charts) that groups type of crimes into 4 levels, with "greatest sever-
ity" the highest concern.  Then properly restricts highest level crimes
from minimum security as shown in Table 7-1.  It does not preclude in-
mates in greatest severity level from Low security.  Respondent in this
case effectively reused crimes (i.e. murder, etc.) already scored (Table
8-2) and PSF limited (Table 7-1) under objective procedure to pile on
more limitations that "propensity or aggravating factors" can now super-
cede greater severity guidelines.  This inventing of enhancement to
management variable discretion changes it from judgement to rule making.
New "greater security" categories are being created to fit inmate's old
case facts, slotting them at whatever security level staff desires, in-
stead of appropriate matching the crimes or offenses to follow  estab-
lished rules.

   6. More serious transgression of specific guideline occurred with sen-
tence length PSF as fixed in Table 7-1.  This stringent rule held old-
law life sentences (see Chapter 5 page 8) from threshold of Low security

for a minimum of 25 years. For respondent to mock its own scoring
system with inaccuracy excuse, when such strict precautions already
exist in place, reeks of arbitrariness and renders BOP determination
to forever keep Petitioner at "greater security" as retribution, not
fair judgement.

7. Respondent misrepresented policy compliance when stating in Ex-
hibit 10-B1 para. 2 "... allow staff to ensure **all** characteristics of
an inmate's case are considered in decisions..." Apparently, BOP's
all is time selective here but not when applying its own violence
guidelines. Because when respondent uses that quote, only petitioner's
long past characteristics (which may no longer be valid) was ever con-
sidered in its decision as shown in all appeal denials. More timely,
detracting evidences are somehow omitted in remedy review for they
were never addressed when repeatedly mentioned during appeal (see
Argument IIB section 6). Additional characteristics favoring Petition-
er, including relevant explanations presenting alternative scenario to
respondent's conclusion concerning past acts were simply ignored or
dismissed outright. BOP's claimed inclusively "after through review"
is hollow and a misstatement. (see Exhibits 5B, 6A, & 6B)

8. BOP strayed from concurrency practice when using sentence detainer
not reflected in BP-338 to raise security (Chapter 7 page 13). Alarm
by respondent is excessive in that BOP deviated from propriety by not
including a management variable expiration date (MVED) equal to the
concurrent sentence detainer inactive date of July 9, 2007. By setting
the MVED indefinitely, BOP is extending the detainer function beyond
intent and authority. If warrant or detainer remains unresolved, then
indefinite status is proper. A sentence detainer here has resolution,
a fixed release date. So an expiration date is called for yet never

27

listed in form to take Petitioner past the purpose of detainer rea-
son for "greater security."

9. BOP exceeded own devised time limitation for institutional in-
fraction (Most serious incident report record) relevancy as pronounced
in Table 8-10.  Table held "GREATEST severity" offenses (i.e. killing,
assaults, escapes, etc.) relevant for 10 years before rescinding the
misconduct against inmate's security scoring matrix.  In effect, BOP
is holding offense record timely and relevant for that duration before
giving inmate a fresh start.  Why should institution offenses of same
magnitude be treated differently then offenses committed before incar-
ceration (history).  Petitioner's long past record's relevance and
timeliness is the issue as BOP is unequally treating misconduct within
institution different than outside.  Where BOP is willing to recognize
10 year relevant conduct limit for internal offense, it is not willing
to recognize the same limitation for even older histories and continue
using such to make adverse determination against Petitioner.  This
backward situation raises question of fairness under 5 USC §552a (g)(1)
(c) where old record relevance was improperly accorded greater defer-
ence and consideration than recent records in determination.

As pointed out, deference placement is pivotal.  Respondent expects
deference to "professional judgement" that stipulates crimes over 25
years ago (old record) still affirms "greater security" requirement,
even though more recent contrary evidences (new record) refutes claim.
BOP's premise depends on broad assumptions with narrow viewpoints (note
need to suppress newer record with older ones) so cannot be accepted in
conclusory or unequivocal fashion as respondent declare.  Such declar-
atory discretion is owed no deference because of the inconsistencies

and conflicts with existing concepts, practices and rules (see earlier sections 1-9). BOP "perceived risks or concerns" cannot prevail in fair hearing as it is not liberally confirmable much less hinted at with any recent pattern of evidence or behavior. Respondent conclusion is highly subjective, thus owed no compliance, and should be rejected to allow impartial, even-handed objective policies determine Petitioner's fate.

Now a reasonable mind cannot blindly accept the evidences offered by BOP as anywhere near adequate to support conclusion without seeing its obvious time flaw. A reasonable mind must see the dichotomy of BOP conclusion when scaled against its most detracting evidence record which proves no "propensity or pattern of violent behavior or misconduct of any sort" during the past 25 years else Petitioner would never have qualified for Low security in the first place given agency's highly stringent, precautionary rules.

Such quality counter evidence that diminishes respondent's offering to inconclusiveness is recognized in America TunaBoat Ass'n v Baldrige 738 F.2d at 1016 when ruling "Even though an agency decision may have been supported by substantial evidence, where other evidence in the record detracts from that relied upon by the agency, we may properly find that the agency rule was arbitrary and capricious."

Beside the insubstantiality of timely evidences, respondent's entire rational depends solely on inferential or possibilities of risk, gleaned from ancient, no longer existing (crime and trial over with) conditions, to carry forth continuing requirement for "greater security." A highly dubious conclusion given passage of time, totally different circumstances and uncorroborated recency of support on record.

BOP doubtful position is exposed by weak tactics of always ignoring

counterproductive evidences, diverting attention to trivia, and
paucity of response to any important claims or counterpoints raised
in grievance appeal (see Argument IIB). Simply put, respondent can-
not logically spell out how long past, obsolete characteristics can
possibly be any risk now, when Petitioner is nearing finality of sen-
tences and have not threatened or harmed anyone during a long span of
time.

Respondent's inability to present current reason for superceding
its own high standards nor prevail with superior collaborating support
in taking petitioner outside guidelines, is decisive. Even with in-
ferior evidences, shallow reasoning process, BOP always default to
sanctity of "management variable" discretion to validate inferences
and assumptions as correctional authority. Such escape-clause option
should not be accorded deference over formal policy rules where it
voids objective intent to stay "within specific guideline" as well as
self immolate professionally established scoring standards as inaccur-
ate. A highly unlikely possibility in this case with over 3 PSF
limitations restricting Petitioner's case.

Respondent action, shown inconsistent or conflicting with agency
policy norms and practices (see Item 1-9), lacking recency of evidences
and principle for drastic departure from precedent, must be considered
arbitrary, capricious or abuse of discretion. These elements meet
ruling in Donovan v Adams 766 F.2d at 807 which quotes " It is set-
tled that where agency departs from established precedents without an-
nouncing a principled reason for such reversals, its action is arbit-
rary, and an abuse of discretion, and should be reversed." As BOP
departed from precedent (overclassification), lacking principle ex-
position for reversal (section 2,3 & 4), while more timely, relevant

facts detract from respondent's evidences, relief is hereby entitled by statutory law 5 USC §706(2)(a).

One last noteworthy ground indicating capricious stand is BOP statement in final denial (exhibit 11 B1, para 3, sentence 7) quote: "P.S. 5100.07 does not entitle you to a particular classification".

In order not to confuse the "entitlement" subject, Petitioner is not using issue as "per se" right under liberty or due process interest. Perusal of Argument I & II should clarify such. While some rights can be associated with official policies or practices, that is not the main gist of argument here.

Claim is BOP's capricious enforcement of policy standards based on whim of agency needs or desired outcome. The validity of policy rules, guidelines, practices thus benefits are variable -- depending on circumstances and who is entitled to what.

The hypocrisy by BOP disclaimer of policy entitlement is now shown by the change in situation. For the past decade, whenever Petitioner requested lower security, BOP always defer to policy standards it created entitling particular classification because rules state (Table 7-1) "your points keeps you there." When points do change, the next rule barrier benefiting BOP to keep Petitioner at a particular level is "PSF sentence length holds you at high." So if inmate do not meet set criteria of 5100.07, withholding of benefits is automatically entitled (used as right) by BOP as response.

Since Petitioner now meets all criteria of Low security, BOP sudden switch of policy emphasis towards insubstantiality is telling. Apparently respondent is free to use policy entitlement to keep Petitioner at a particular classification, high, for decades then disavow the

31

same policy compliance (along with devaluing its indicated scoring accuracy) whenever created practices (rules & guidelines) finally benefits inmate.

Such rapid transition of precedents set by policy, depending on ultimate outcome agency desire, instead of trusting scored results after 25 years, is the arbitrary abuse complained in Administrative Appeals.  Petitioner only seeks fair application of agency objective rules.  He simply is asking court now to remind BOP to follow its classification scoring as defined in Table 7-1 of P.S. 5100.07, and not complicate things to avoid its duty with expedient loopholes. Return Petitioner's security level to its normalized score.

IV.    BUREAU OF PRISONS PERSECUTION OF ASSUMPTIVE "GREATER SECURITY"
       CONTINUUM AGAINST ELDERLY, MODEL INMATE WHO FOR 25 YEARS
       REPRESENTS NO THREAT IS IRRATIONAL.

The word security cannot be used broadly by government to sweep
under "like dirt behind rug" covering of their discretion to over-
classify Petitioner eternally.  Even in confinement cases where place-
ment is discretionary, some objective cause is required.

The tangible facts surrounding Petitioner's placement is readily
discernible.  Clearly evident as detailed in statement of facts and
exhibits are his offense history, sentence situation, incarceration
record, aging medical liabilities and physical limitations.  The vast
majority of relevant facts affecting present security determination
favors Petitioner.

He is near end phase of both sentences, with serious medical and
physical difficulties that makes it highly unlikely for him to become
violent.  Due to deteriorating joints and muscles (medication causes
repeated leg cramps and spasms), while in constant pain, he is unable
to run, can barely walk without aids, and have trouble performing sim-
ple moves like standing up or bending, much less have any strength or
balance to hurt anyone.  Petitioner's lengthy, benign record of impec-
cable conduct speaks well and confirms his disinclination for any
violence now or in the future.

In lieu of predominate indicators refuting possibility of any vio-
lent outbreaks, respondent cling to "violence displayed during instant
offense" (note misleading time frame 'during instant' like violence just
happened) as reason to overclassify Petitioner.  Significantly, BOP neg-
lects to mention "over 25 years ago" in all justifying statements imp-
licating impending danger with evidences offered.  As such, the ration-

ality of forever persecuting "greater security" management variable
rule/ruling against Petitioner is the fact-in-issue (paragraph 6 of
Petition).

The objective cause courts have always ruled in this area affirm,
"Prison Administrators when making classification "need only demon-
strate a rational basis for their distinctions"." quoting from Smith
v Couglin 748 F.2d at 787 with internal quote from Jones v N.C. Pri-
soners' Union, Inc. 433 US at 134, 53 L.Ed.2d at 644.  Petitioner asks
judicial oversight of reasonableness or rationality "as applied" from
the evidences to BOP policy, statutory and case law.  Request is in
accord with Salaam v Lockhart 905 F.2d at 1171 "The substantial deference
accord officials does not relieve federal court from their duty to
"make sure after independent review of the evidences that the regula-
tion is not a exaggerated response to prison concerns."" with internal
quote from Thornburgh v Abbott 104 L.Ed2d at 476 and Turner v Safley
482 US at 88-93, 96 L.Ed.2d at 83-85. (Referred later as Abbott/Turner
test)

Statements from Administrative Responses show two issues or lines
of reasoning for distinction.  Both are no longer supported by reason-
able basis.

First, the minor issue but only tangible one, is sentence detainer
not shown on BP-338 form.  It is one of 3 objective examples given in
policy, Chapter 7, page 13 of P.S. 5100.07.  The crucial basis, however
as revealed in exhibit 5A, recognizes that "detainer remains active
until 2007."  To push "greater security" at this late stage is trifle.
Flight risk is non-existent as detainer will end shortly and Petitioner
have no intent nor capability to escape in his ailing condition.

34

If sentence detainer is true concern of BOP ruling, a Management
Variable Expiration Date (MVED) would have been listed in the BP-338
**MVED** field.  That inactive date would equal the sentence release date
which is documented as July 9, 2007.  Petitioner can accept respondent
discretion on that basis had a logical ending date been listed.

The parameters of detainer rule and rational meet all the Abbott-
Turner factors of content-neutrality and reasonableness and **not** have
imposed atypical deprivations or significantly violated liberty interests.
The major grievance arise when BOP subjectively apply the management
variable "greater security" _indefinitely_, using assumptive distinction
for classification.

The core rationale and predominately conjectual based alarm is BOP's
fabrication of "greater security" concerns today from "violence displayed
during instant offense",(see exhibit 11B1, para 3, sentence 2) to justify
disparity of treatment.  Respondent's stance can be garnered by reading
its response statements.  Repeating all the individual details will be
redundant.  The central theme from all offenses cited is suffice to
verify the determining process.

Respondent's prime dictum is past violence predicts "propensity for
violence" inevitability (see exhibit 10B1 para 3).  Violence is valid
concern but the key word "propensity" **never occurs in any violent ten-
dencies or patterns in the next 25 years** -- exposing the presupposed
danger as exaggeration, an illusory threat.  BOP's unabating threat
behavior conjecture is repudiated by own policy exposition (Chapter 8,
page 8) which logically diminishes violence risk with time passage.

Such impetuous diagnosis "propensity for violence", in face of
superior contradictions, without direct expert clinical or psychiatric
examination, is not only unqualified opinion but reckless speculation.

This is the irrational, highly speculative or exaggerated concerns disguised as reason for distinction, applied in discretionary manner by BOP that court must independently review and provide fair adjudication when Petitioner's rights are severely disrupted.

Deference must not blindly be ceded to BOP's biased foresight in perceiving imminent violent conduct from Petitioner forever.  While confirmation of continuing violences is true in many cases, in this instance, diverge from correctional precepts.  The critical piece of tangible fact, over 25 years of non-aggressive, peaceful record of behavior, just don't fit the violent picture puzzle BOP is piecing together.  Given respondent's accusative "propensity" characteristics, a reasonable mind would expect much more substantiation during such lengthy time period.

Noteable factors refuting further criminal actions were not considered in respondent's antiquated based conclusion.  Aging, ailing Petitioner, in present arthritis pain-weakened state, is incapable of violent aggression much less threaten the security of any facility.  To prolong a non-existent danger, is not only misleading but a disservice to legitimate penological objectives.

Another important element regarding past violence displayed never balanced into respondent's ruling was cause or motivation during that time.  Petitioner is not justifying those wrongful acts in any shape or form, rather attempting to present how the underlying impetus for his violent behavior no longer exists.  All violence displayed during instant offense were his desperate attempts to conceal his crimes (murder) then later in refusing to face prosecution and punishment (threatening and attacking witness during trial).

Because Petitioner has long since accept responsibility along with society's retribution for crimes committed, and reconciliation to reform from ever breaking any laws, there is demonstrated proof of long duration showing changed nature. With no longer any illegalities to hide or need to avoid prosecution, all causes for previous displays of violence disappears. Which is unequivocally why Petitioner will never redisplay behaviors from past offenses again. With parole looming, further tranquility is most certainly assured as he strives to become a productive and law abiding member of society.

Petitioner's desire to improve by choice and motive is eradicated by BOP's preconceived dogma that criminals will always commit crimes, or a person can not change. Such unyielding assumptions precludes fair consideration and chance to progress.

Respondent assumes the facts needed to decide Petitioner was danger-ous "have been ascertained" indelibly when "greater security" is applied. That assertion simply ignores the passage of time. Even if Petitioner was a threat 25, 15, or even 10 years ago, it cannot be taken for granted that he remains a threat today. Further, since there have been no negative indicators since, earning him low security status, respon-dent presumes trolling the past assumptive threat forever.

Situations, affecting characteristics, attitudes, capabilities, and even propensity do not remain static as BOP inflexibly assume and con-jecturize against Petitioner's future. This is the unrealistic, re-cycled, and stagnant correctional concerns a fair mind cannot accept as just or reasonable after such long time. At what point then does overly cautious measures become excessive or irrational? 27 years, 30 years, 40 years or is there any limit to be placed at all.

37

In complete twist of role reversal, the BOP is claiming fault with its standardized scoring, denouncing it as suddenly inaccurate and not reflect true security needs (Exhibit 10B1, para 2). Usually inmates are ones challenging Bureau standards as unrealistic, but for agency to now attack its own created security norms is absurd. Given anomaly can occur with new or poorly conceived schemes, this is certainly not the case or situation here. With a strict 25 year limit (PSF sentence length) in place and 7 upgrade revisions since 1979, the latest making it even harder to attain Low score by narrowing security cut point from 10 to 8. To now insist own policy is somehow defective because it under-rates Petitioner's needs at this late phase into sentence is outlandish. As discussed at end of Argument III, BOP disclaimer of policy authority and practice is hypocritical since the same policy precedents and standards were used by agency to keep Petitioner at high security for decades. Why was scoring accuracy proper then but all of a sudden not now is a mystery needs explaining.

This is the incongruous, slippery policy stand BOP is asking court to believe and accept under correctional expertise and discretion. Ironically, Petitioner is one claiming trust be held in agency's professionally developed, time tested classification scoring system, just not in the loophole judgement rule. Given BOP's inverted logic with own policy, the Darconian assumptions applied into Petitioner's case, its discretion to increase security level perpetually is unreasonable and excessive.

As BOP will not follow its objective policy norms, deviating to subjective management variable rule instead, that practice is challenged. Since entitling authority quoting Program Statement 5100.07 is asserted by respondent, the constitutionality and reasonableness of such broadly overriding rule is requested be put to Abbott-Turner examination.

Applying BOP's management level "greater security" ruling to Tur-
ner test as applied, reveals many problem areas of abuse.  Shown ear-
lier, this openly subjective rule (when actuated as case with violence
displayed from long past history) "fairly invite[] prison officials to
apply their own personal prejudices and opinions as standard for pri-
soners." quoting Shakurv v Selsky 391 F.3d at 114.  The same rule also
oversweepingly permits "an exaggerated response based on speculations
of prison officials unsupported by a reasonable basis." quoting Nicols
v Nix 810 F.Supp. at 1467.  This overly pliable rule procedure in fact
give staff reason to invent criteria like "violent propensity" (rule
making?) to categorily fit case facts for ulterior purposes, instead
of obeying specific guidelines (scoring level) already formalized by
policy to dictate decisions.  Such case by case decision-making flex-
ibility invites favoritism, disunity and inconsistencies that creates
appearance of discrimination.  The antithesis of what P.S. 5100.07 was
suppose to achieve.  Offering conditionalities (inaccuracy and one way
entitlement excuses) that denigrate own policy results does not lend
credence to "reflect and support professional judgement" discretionary
ruling either.  The immediate and lingering consequences of "greater
security" rule produces severe deprivations, especially when applied
indefinitely, and trample constitutional interests as argued in I & II.

Having shown the rule (management variable) broadly subjective,
thus open to misuse, and ruling (propensity for violence) invalid,
lacking recent factual basis, BOP's continuing persecution of "greater
security" against Petitioner is irrational therefore should be recinded.

V.   BOP REMEDY DENIALS REFLECT RETRIBUTION AGAINST PETITIONER
     FOR CRIMES COMMITTED RATHER THAN CALM DELIBERATION OF TRUE
     SECURITY NEEDS TO SET PROPER INDIVIDUALIZED SYSTEM OF CARE
     AND PROTECTION.

Even with preponderant certainty of non-violent behavior and
agency objective scoring  supporting Low security placement, res-
pondent still promotes a "greater security" dangerousness facade
against Petitioner. Why?

Simply, personal opinion or undue prejudice entered decision at
one time and respondent will not correct that error.  Such possibility
is documented by introduction of irrelevant and inflammatory details
from past histories listed as justification for denial to Low security.
(see Exhibit 9B1, para 2 and 10B1, para 3)  Aggravating factors such
as "young age", attacking witness during trial, and other tidbits as
"videotaping" have no tangible links to greater risk implications at
lower security today any more than at higher one.  If there is such
direct relationship, BOP never gave credible explanation proving
greater threat -- always inferred speculative risk from obsolete acts.

Such incendiary techniques are illegitimate offerings to shift
emphasis from calm reasoning to emotion.  The questionable purpose
in repeating those abhorrent deeds is to abandon fair evaluation of
Petitioner's reformation over time, in preference to perpetuating
vindictive judgement towards nature of offense perpetrated.

By suspending agency's objective scoring norms with subjective
discretion entitled by management variable rule, lets BOP form quasi-
vigilante system, distinguishing crimes that are morally repugnant
in favor of obeying merits set by policy precedents.  Courts have set
where particular action taken by prison officials amount to punishment

40

"generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."" quoting Bell v Wolfish 441 US at 538, 60 L.Ed.2d 447 with internal quote from Kennedy v Mendoza-Martinez 372 US at 168-169, 9 L.Ed.2d 644.

As before the management variable assignment (alternative purpose) is not rationally connected to irrelevant, untimely evidence offered. BOP ruling centered on speculative concerns that 25 year old violences are still reliable predictors of current threat, regardless of what else happened since. That stance cannot be fairly assumed to remain valid or sufficient forever. Respondent's rational was refuted by discourse in earlier argument IV.

The excessiveness relationship decisively cements respondent's alternative purpose as punitive with intentional disregard taking Petitioner outside agency's set standards of record relevancy (table 8-10), violence risk (table 8-5), and PSF sentence length. Extending "greater security" deprivations forever upon aging, chronically ailing inmate is extreme, an overpreventative measure in view of all the positive improvements on record, while serving no purpose but retribution.

Reading 18 USC §4081, respondent is directed to ponder   "...other factors as should be considered in providing an individualized system of ... care..." Why now should Petitioner be not granted benefit earned within policy to prove suitability for eventual reintegration into society? Why should he not be allowed work assignment placement at Medical Center like Rochester, MN where he may receive life saving care should major health failure occur and family visits?  Why should he

41

be forever subjected to fear for life and harm from violence when policy norms allows placement in safer environs?  These are the alternatives that are also legitimate penal objectives never factored by respondent as required by statute 18 USC §4042, §4081 and agency P.S. 5100.07.

Petitioner's record incontrovertibly proves lack of distinct threat against institution security.  Petitioner have never harmed staff or inmates, have no longer any pattern of violences, no escapes, and harmonously adjusted to serving out his sentence.  With such more relevant facts then ones relied upon, what further proof does the BOP expect before finally accepting wisdom of own policy standards. _

Respondent need now explain why Petitioner should still be singled out for such disparate treatment and show court why everlasting "greater security" overclassification does not constitute excessive punishment.

## RELIEF REQUESTED

Request for mandamus action is appropriate as Petitioner has shown clear right to relief, respondent has clear duty to change irrational, arbitrary/capricious or unconstitutional act in question, and Petitioner have no adequate alternative for justice.

Relief will not result in immediate release, shorter sentence, community (minimum) access, or even lower custody level. The removal of "greater security" will simply restore Petitioner's record, still delimited by all security and Public Safety Factors to the same objective policy level criteria all Federal inmates enjoy.

Relief sought is proportionate with remedying only respondent's excessive discretion outside policy and lawful bounds. For all the forgoing reasons, this petition for Habeas Corpus with Mandamus relief should be granted.

Respectfully Submitted.


Ming Shiue   00499-041

P.O. Box 1500

El Reno, OK   73036-1500

09/65/66

43